UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHANELLE COUSINS,                    :
                                     :CIVIL ACTION NO. 3:17-CV-836
            Plaintiff,               :
                                     :(JUDGE CONABOY)
        v.                           :
                                     :
                                     :
NANCY A. BERRYHILL,                  :
Acting Commissioner of               :
Social Security,                     :
                                     :
            Defendant.               :
                                     :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Doc. 1.) Plaintiff protectively filed an application for benefits on July 5, 2013. (R. 19.) After she appealed the initial denial of the claim, hearings were held on August 25, 2015, and January 12, 2016. (*Id.*) Plaintiff requested to amend the alleged disability onset date to January 27, 2014. (*Id.*) Administrative Law Judge ("ALJ") Sharon Zanotto issued her Decision on August 12, 2016, concluding that Plaintiff had not been under a disability from the alleged onset date of of January 27, 2014, through the date of the decision. (R. 33.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on February 6, 2017. (R. 1-6, 14-15.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on May 10, 2017. (Doc. 1.) She asserts in her supporting brief that the ALJ erred on two grounds: 1) the ALJ based the Plaintiff's residual functional capacity ("RFC") on her own lay opinion; and 2) the ALJ did not properly evaluate Plaintiff's symptoms. (Doc. 9 at 1-2.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was born on January 17, 1964, and was fifty years old on the amended alleged onset date. (R. 31.) She has a limited education and past relevant work as a certified nurse assistant and a home health aide. (*Id.*)

### A. Medical Evidence[1]

An August 29, 2013, Disability Report indicates that Plaintiff identified the following conditions as limiting her ability to work: diabetes, thyroid, depression, bipolar, heart, and high blood pressure. (R. 329.)

Plaintiff visited the Kline Health Center on June 4, 2013, complaining of right thumb pain which had started a week before. (R. 491.) Office notes indicate that Plaintiff's diabetes was poorly controlled and she was encouraged to return to her primary care provider for diabetes management. (R. 491, 493.) On June 28,

---

[1] The Court's review focuses on evidence relied upon by the parties and the ALJ.

2013, Plaintiff saw Joan Weaver, CRNP, at Kline Health Center to go over lab tests. (R. 499.) Ms. Weaver noted that Plaintiff's A1c was better but still too high and Plaintiff may need to adjust her insulin. (R. 499-500.)

On August 27, 2013, Plaintiff presented at Harrisburg Hospital with chest discomfort. (R. 459.) Her past medical history included hypertension, diabetes, and dyslipidemia. (*Id.*) Plaintiff was found to have an elevated troponin and was admitted with a non-ST segment elevation myocardial infarction. (*Id.*) Plaintiff had cardiac catheterization, angioplasty, and stent placement and was discharged on August 29, 2013. (R. 463.) At a September 6, 2013, follow up visit with Angel Cirilo, M.D., he noted that Plaintiff had no acute complaints and was feeling better. (R. 530.)

Plaintiff saw her cardiologist Aarti Campo, M.D., on September 13, 2013. (R. 594-97.) He reported that Plaintiff continued to have chest discomfort and shortness of breath, noting that Plaintiff was "a poor historian and it is difficult to illicit details about these episodes from her." (R. 596.) Dr. Campo sent Plaintiff for further testing and advised her to keep a log of her symptoms to assist with gaining a better understanding of them. (*Id.*)

On September 25, 2013, Plaintiff presented at Pinnacle Health Internal Medicine Associates with pain on her right side from her

back to her front which had started two days earlier.  (R. 702.)
Review of Systems was negative for chills, fatigue, fever, chest
pain, anxiety, depression, insomnia, dizziness, extremity weakness,
gait disturbance, headache, memory impairments, numbness in
extremities, back pain, joint swelling muscle weakness, and neck
pain.  (R. 702-03.)  It was positive for abdominal pain.  (R. 702.)
Jessica Stefanic, CRNP, assessed a possible urinary tract
infection, started an antibiotic, and planned additional tests.
(R. 703.)

Plaintiff was seen by Michael Vanscoy, M.D., at Pinnacle
Health on November 13, 2013, for pain in both hands and pain in her
shoulders when she flexed her arms.  (R.705.)  She reported that
her sugars were better controlled, but Dr. Vanscoy noted that she
had symptoms which he believed were related to uncontrolled
diabetes.  (R. 705, 707.)  A November 13, 2013, report from the
Pinnacle Health Polyclinic Diagnostic Department indicated that
hand studies showed very minimal scattered degenerative changes,
more pronounced within the left fifth DIP joint and no acute right
or left hand abnormality.  (R. 681.)

At a December 16, 2013, consultation, Linda Sobkowksi, CRNP,
of Pinnacle Health's Kline Health Center made the following
physical examination findings: normal respiratory effort; normal
vascular findings; musculoskeletal normal range of motion, muscle
strength, and stability in all extremities with no pain on

inspection; normal examination of the extremities; neurologically memory intact, no sensory loss, normal fine motor skills, and preserved and symmetric deep tendon reflexes; and psychiatrically oriented to time, place, person, and situation with appropriate mood and affect. (R. 712.) A dietition referral was made for Plaintiff's uncontrolled diabetes, her hypertension was noted to be controlled, lipitor was increased for the hyperlipidemia, a nephrology referral was made of chronic kidney diseases, stage II, and neuropathy was noted to be controlled with Gabapentin. (R. 713.)

On January 16, 2014, Plaintiff saw Dr. Campo for follow up of coronary artery disease and hypertension. (R. 618-20.) She had a blood pressure monitor which indicated lower readings over the preceding few days. (R. 618.) Plaintiff said she had adjusted her diet but she did not exercise. (*Id.*) Dr. Campo noted that Plaintiff continued to have left breast pain, mostly at night, and she was going to talk to her primary care doctor at her January 21, 2014, appointment. (*Id.*) In addition to the breast pain, the Review of Systems indicates that Plaintiff reported fatigue, arthritis (denied cramping and joint pain), and occasional headaches and numbness/tingling (denied lightheadedness and loss of consciousness). (R. 619.) Physical exam showed that Plaintiff was overweight but otherwise normal findings were recorded. (*Id.*) Dr. Campo assessed Plaintiff with atypical non-cardiac chest pain for

which she would see her primary care provider. (R. 620.) He noted that Plaintiff's blood pressure was well controlled on her current regimen, he encouraged Plaintiff to exercise daily and continue a low fat diet in connection with her hyperlipidemia, and he wanted to see her again in one year. (*Id.*)

On January 27, 2014, Plaintiff had another office visit with Ms. Sobkrowski at which time she reported regarding diabetes that she was experiencing "dyesthesias - numbness, frequent urination and polydipsia." (R. 715.) She denied chest pain, diarrhea, dyapnea, heartburn, weight gain, and weight loss. (*Id.*) Plaintiff reported no symptoms associated with her hypertension or hyperlipidemia. (*Id.*) Physical examination was much the same as the previous month except that monofilament exam was abnormal although the assessment noted that neuropathy was controlled with Gabapentin. (R. 717-18.) Diabetic foot screening was also performed at this visit and showed there had been no change since the previous evaluation and her Risk Category was 1 "Loss of protective sensation – with no weakness, deformity, callus, pre-ulcer or history of ulceration." (*Id.*)

On February 21, 2014, Plaintiff saw Sunita G. Ray, M.D. at the Milton S. Hershey Medical Center Nephrology Clinic. (R. 834-36.) Dr. Ray noted that Plaintiff complained of frequent urination and intermittent chest pains but she reported that she felt well overall with no complaints of shortness of breath, leg edema,

6

fever, chills, nausea, vomiting, diarrhea, abdominal pain, dizziness, or headaches.  (R. 834.)  Dr. Ray planned to do more testing related to kidney problems and increase Plaintiff's hypertension medication.  (R. 835.)

Between March 2014 and August 2014, Plaintiff treated at PA Retina Specialists for ocular complications related to diabetes. (R. 723-43.)  Provider Thomas R. Pheasant, stressed the importance of blood sugar control in the prevention of such complications. (*See*, *e.g.*, R. 725.)  He reported a diagnosis of Severe Nonproliferative Diabetic Retinopathy OU and administered a laser treatment on July 1, 2014.  (R. 727.)

On July 7, 2014, Plaintiff presented to the hospital with complaints of intermittent chest pain.  (R. 627.)  Plaintiff was admitted and, though EKG and cardiac enzymes were normal, she was scheduled for a cardiac catheterization and possible PCI.  (R. 630.)  Following left heart catheterization, left ventriculography, and left posterolateral drug-eluting stent implantation, William Bachinsky, M.D., recorded the following impression: normal LC systolic function; patent third obtuse marginal stent with new severe stenosis involving left posterolateral; and successful left posterolateral drug-eluting stent implantation.  (R. 636.)

At a February 26, 2015, Kline Health Center office visit, the provider noted that Plaintiff's diabetes was "[u]ncontrolled due to noncompliance, states that she gets tired sometimes injecting

insulin."  (R. 720.)

Plaintiff was admitted to the hospital on March 15, 2015, with the "Highest Priority Diagnosis on Admission" recorded to be hypertension urgency.  (R. 777.)  Plaintiff presented with headache, nausea, blurry vision, and left arm heaviness.  (R. 779.) Plaintiff's blood pressure was elevated but physical exam was normal except for mild decreased sensation in the right upper extremity.  (R. 781-82.)  Her coronary artery disease, diabetes, hyperlipidemia, and depression were noted to be stable.  (R. 782.) Plaintiff was discharged on March 17, 2015, at which time the physical examination revealed no problems.  (R. 777-78.)

At her March 24, 2015, hospital discharge follow-up at Kline Health Center, Plaintiff reported that her blood pressure had been high and she had not been compliant with taking all of her prescribed medications but since her discharge she had been feeling well and was medication-compliant.  (R. 876.)  Notes indicated that Plaintiff denied chest pain and shortness of breath but complained of right lower quadrant abdominal pain which started the previous month, was intermittent, and occurred after meals.  (*Id.*)  Review of systems was otherwise normal.  (R. 876-77.)  Physical exam findings were also normal.  (R. 877; *see also* R. 873.)  Plaintiff agreed to an endocrinology referral for her diabetes.  (*Id.*)

On April 24, 2015, Plaintiff was seen by Michael Link, M.D., at the Pinnacle Health CardioVascular Institute for a pre-

colonoscopy screening. (R. 819.) Dr. Link noted that Plaitnff reported she had not had any further episodes of chest pain since her last stent in July 2014. (*Id.*)

At a CardioVascular Institute follow-up visit on July 14, 2015, Aarti Campo, M.D., noted that Plaintiff had modified her diet, she had occasional chest pain, and she had a normal nuclear stress test in April. (R. 816.) In addition to presenting problems, Review of Systems indicates that Plaintiff reported fatigue, arthritis (denied cramping and joint pain), and occasional headaches and numbness/tingling (denied lightheadedness and loss of consciousness). (R. 817.) Dr. Campo determined that Plaintiff should remain on Plavix lifelong and continue her other heart medications. (R. 818.)

On July 24, 2015, Plaintiff presented at Pinnacle Health Harrisburg Campus Emergency Department with chest pain. (R. 797.) Plaintiff was not admitted but was discharged to home in stable condition with instructions to follow up with her primary care provider in seven days and her cardiologist as scheduled. (R. 798, 804.)

At a November 20, 2015, routine visit to Kline Health Center, Plaintiff complained of left shoulder pain of two-month duration, and right should pain of one-month duration which were not due to injury and had gotten progressively worse. (R. 868.) She reported that the pain was achy and intense when she lifted her arms over

ninety degrees. (*Id.*) Plaintiff also complained of abdominal pain that she described as sharp and worse about one hour after eating, especially after eating fatty foods. (*Id.*) She added that it subsides about an hour or two after eating. (*Id.*) Plaintiff also reported that she got frequent heartburn. (*Id.*) Physical exam was normal except for neck goiter. (R. 869.) Provider Sayed Kazi, M.D., referred Plaintiff to orthopedics for shoulder evaluation, and instructed Plaintiff to cut fat out of her diet as much as possible to address the abdominal tenderness and to evaluate the gall bladder if pain persisted. (R. 870.)

On December 2, 2015, Plaintiff had shoulder x-rays after complaining of bilateral shoulder pain which was unrelated to trauma or injury. (R. 879.) Acromioclavicular joint space narrowing of both shoulders was found and the Impression of moderate degenerative change at acromioclavicular joints was recorded. (*Id.*)

On December 31, 2015, Plaintiff presented to Kline Health Center with breast leakage. (R. 864.) Other than the presenting problem, Review of Systems was negative and physical exam was normal. (R. 864-65.) Further breast screening was planned. (R. 866.)

**B.  *Opinion Evidence*[2]**

**1.  <u>Consulting Examiner</u>**

Brian D'Eramo, D.O., conducted a Disability Determination Examination and completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities on December 13, 2011.  (R. 415-20.)  He recorded that Plaintiff stopped working as a CNA in February 2011 due to lumbar back pain, noting that her job required her to move, lift, and transfer patients, some of whom were very heavy.  (R. 415.)  Examination showed 5/5 strength in all extremities and 2/4 reflexes, and minor paraspinal muscle tenderness in the lumbar region.  (R. 417.)  He diagnosed lumbar back pain (mechanical in nature), a history of diabetes and diabetic neuropathy, hypertension, and ADHA, depression, and bipolar disorder.  (R. 418.)  Dr. D'Eramo noted that there was a question of how well Plaintiff's sugars were controlled, she complained of a lack of focus but she seemed fairly focused at the exam, she was unable to seek counseling due to financial issues, and he did not see that she was on any medications for anxiety, depression, or bipolar disorder.  (*Id.*)

Dr. D'Eramo concluded that Plaintiff could frequently lift or carry two to three pounds and occasionally ten pounds, she could

---

[2]  The Court does not review State Agency psychologist's opinions in that Plaintiff argues only that the ALJ erred in her assessments of opinion evidence related to physical impairments. (*See* Doc. 9 at 7.)

stand and walk six hours or more, she could sit for eight hours, pushing and pulling were unlimited, she could occasionally perform all postural activities, she had no other physical function limitations, and she had environmental restrictions related to heights and moving machinery. (R. 419-20.)

## 2. **State Agency Medical Consultant**

On January 30, 2014, Harshadkumar Patel, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 152-54.) He opined that Plaintiff could occasionally lift and/or carry fifty pounds and frequently twenty-five pounds, she could stand and/or walk and sit for six hours in an eight-hour workday, her ability to push and/or pull was unlimited other than indicated for lift/carry, she could occasionally perform all postural activities, and she had no manipulative, visual, communicative, or environmental limitations. (R. 152-53.)

## 3. **Treating Providers**

On January 15, 2016, Joshua Jackson, M.D., completed a Physical Residual Functional Capacity Questionnaire. (R. 885-89.) Dr. Jackson noted that his length of contact with Plaintiff was one year and his diagnosis was bilateral shoulder arthritis, and a bilateral hand contracture problem. (R. 885.) He indicated Plaintiff's symptoms were chronic pain, fatigue, and vertigo, specifically sharp pain in her shoulders, hands, and legs, and constant pain with movement which were supported by physical

examination limitations, loss of strenght, and imaging studies.
(*Id.*)  Dr. Jackson noted that medications taken by Plaintiff--
Gabapentin and Naproxen--could cause dizziness, her impairments had
lasted or were expected to last twelve months, she was not a
malingerer, and emotional factors did not contribute to her
symptoms and functional limitations.  (R. 886.)  Dr. Jackson opined
that Plaintiff's experience of pain or other symptoms would
constantly interfere with attention and concentration needed to
perform even simple work tasks and she was incapable of even low
stress jobs because of extreme pain.  (*Id.*)  He concluded that
Plaintiff could walk two city blocks without rest or severe pain,
she could sit for twenty minutes at a time, stand  for fifteen
minutes at a time, she could sit for less than two hours in an
eight-hour workday and stand/walk for the same length of time, she
needed to include periods of walking around during the workday, she
needed a job that permitted her to shift positions at will, she
would need to take unscheduled breaks four times a day for twenty-
five minutes each, and she would need to keep her legs elevated at
30 degrees for one-half of the workday.  (R. 886-87.)  Dr. Jackson
found that Plaintiff could occasionally lift ten pounds, she could
occasionally look down, turn her head left or right, look up, and
hold her head in a static position, and she could rarely twist,
stoop, crouch/squat, climb ladders, and climb stairs.  (R. 888.)
He determined that Plaintiff had significant limitations with

reaching, handling, or fingering. (*Id.*) Dr. Jackson opined that Plaintiff's impairments were likely to produce good days and bad days, and she was likely to miss work more than four days per month. (*Id.*) Finally, Dr. Jackson noted that the earliest date that the description of symptoms applied was December 5, 2015. (R. 889.)

On January 19, 2016, a Kline Health Center provider filled out a Certificate to Return to School/Work. (R. 890.) The provider noted that Plaintiff had been diagnosed with left first and fifth digit trigger finger as well as osteoarthritis. (*Id.*) The provider also noted that Plaintiff had been scheduled for surgery but due to other health conditions such as diabetes and elevated glucose levels the surgery had to be cancelled. (*Id.*)

## C. *Hearing Testimony and Function Report*

### 1. <u>Function Report</u>

In the Function Report completed on September 12, 2013, Plaintiff indicated that she was unable to work due to back pain. (R. 336.) She said she stayed on the couch most of the day and sat on the porch for about an hour. (R. 337.) In response to the question of whether she took care of anyone else and, if so, what she did for them, she said her granddaughter but added that she did "nothing she is just in my care." (*Id.*)

Plaintiff said her conditions affected her sleep in that she was up all night. (*Id.*) Regarding personal care activities,

Plaintiff had no problems but she forgets to take her insulin sometimes. (R. 337-38.) Plaintiff said she does not prepare meals because she cannot stand for long and she gets dizzy. (R. 338.) She also said she does no house or yard work because she cannot do any lifting. (*Id.*) Plaintiff indicated that, at the time, she was not going out alone because she had just had a heart attack and her family did all of her shopping. (R. 339.)

2. **Hearing Testimony**

Testimony at the August 25, 2015, hearing indicates that Plaintiff's alleged onset date is based on the fact that she turned fifty a few days before the amended onset day of January 27, 2014, and she had an office visit on that date. (R. 51.)

Plaintiff said she lives with her eight-year-old granddaughter who has lived with her since she was one and she is the primary caregiver. (R. 60.) She testified that she stopped working as a home healthcare aide because of problems with her feet and her back. (R. 52-53.) She said that she originally took a leave and then her doctor at Kline Health Center did not think she should go back because she was having a lot of complications. (R. 53.) Plaintiff also said she had not looked for work since because of problems with neuropathy and diabetes--she gets tingling and swelling in her feet that interfered with standing on her feet for a long period of time, estimating that time to be about two hours. (R. 54-55.) Plaintiff noted after she sat for half an hour she

15

could stand again and she had no limitations as to how long she could sit. (R. 55.) She estimated she could walk for a block or two before the foot symptoms started and then she would go home and prop her feet up. (R. 56.)

When asked about lifting, Plaintiff said the heaviest thing she could lift was a gallon of milk and she could not lift more than that because she had trigger fingers in both hands, both thumbs and one index finger. (R. 56.) She added that the trigger fingers were also very painful and caused trouble not only with lifting by with thins like buttoning.[3] (R. 57.) Plaintiff reported that she could use a broom and mop but she had to sit to do dishes because of her feet. (R. 58.) She noted that her grandson took out the trash and her daughter cleaned for her and helped her shop but she was able to do the laundry and cook. (R. 59-60.)

Plaintiff testified that she was functioning okay regarding her heart problems but her mental health affected her ability to work because of depression. (R. 61.) The ALJ asked Plaintiff if there were other problems she felt were important for her to know about and Plaintiff responded that there were not. (R. 65.)

---

[3] ALJ Zanotto clarified that orthopedic records and/or a specific diagnosis related to the trigger finger problem were not in evidence and she would need that to consider related limitations. (R. 91-92.) The ALJ told Plaintiff's attorney about the importance of following up and submitting supporting medical records and Plaintiff's attorney indicated that she would try to get them. (R. 92-94.)

16

However, Plaintiff's attorney then asked about problems with frequent urination which Plaintiff confirmed, stating that she probably needed about four bathroom breaks in a two-hour period. (*Id.*)  When asked if she had problems with her vision, Plaintiff responded that she gets blurry vision in her left eye at least three times a day and usually gets a damp rag to put over it until it goes away.  (R. 66-67.)

When asked if she would be able to use her hands repetitively, Plaintiff agreed that she would not be able to pick things up and move them constantly throughout the day.  (R. 69.)  Plaintiff then explained that surgery had been recommended but because of her sugars being high and the blood thinners for her heart, the surgery could not be done at the time.  (R. 70.)

At the supplemental hearing held on January 12, 2016, Plaintiff confirmed that she continued to have symptoms related to diabetes including frequent urination (every other hour) for which she did not take medication, and neuropathy which caused constant aching in her feet and sometimes her ankles for which she began taking Gabapentin in 2012.  (R. 90, 95, 96.)  Plaintiff added that the pain in her feet made standing and walking difficult and she could probably only stand for an hour.  (R. 100, 104.)  She testified that she props her feet up to alleviate some pain when she is at home.  (R. 105.)

Plaintiff reiterated the problems with her hands, noting that

she was still unable to get surgery.  (R. 90.)  She also said that the only medication she took for the pain was Tylenol.  (R. 90-94.)

**D.    ALJ Decision**

With her August 12, 2016, Decision, ALJ Zanotto determined that Plaintiff had the severe impairments of coronary artery disease status post stent placements, degenerative joint disease of the bilateral shoulders, diabetes mellitus, neuropathy, hypertension and thyroid nodules.  (R. 21.)  The ALJ also determined that Plaintiff had additional impairments which she found non-severe including trigger finger, chronic kidney disease, high cholesterol, diabetic retinopathy, and mental health impairments.  (R. 21-24.)  ALJ Zanotto concluded Plaintiff did not have an impairment or combination of impairments that met or equaled a listing.  (R. 24.)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work "except that she requires the opportunity to alternate between sitting and standing at will without a loss of productivity.  The claimant is capable of occasional climbing of ramps and stairs, balancing, kneeling, stooping, crouching and crawling, but cannot climb ladders, ropes or scaffolds."  (R. 25.)  In explaining the RFC, ALJ Zanotto gave partial weight to Dr. Patel's opinion--although she agreed with some of the stated postural limitations, she found that the limitation to medium work was not extensive enough.  (R. 30.)  She

gave partial weight to Dr. D'Eramo's opinion, identifying several reasons for doing so. (*Id.*) ALJ Zanotto also gave partial weight to Dr. Jackson's opinion, again identifying numerous reasons for her assessment. (R. 31.)

With the RFC set out above, ALJ Zanotto concluded that Plaintiff was unable to perform past relevant work but jobs existed in significant numbers in the national economy that she could perform. (R. 31-32.) She therefore found that Plaintiff had not been under a disability as defined in the Social Security Act, since Janurary 27, 2014. (R. 33.),

Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4] It is necessary for the

---

[4] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists

19

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person

---

for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 31-32.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if

> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.*

*Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the ALJ erred on two grounds: 1) the ALJ based the Plaintiff's residual functional capacity ("RFC") on her own lay opinion; and 2) the ALJ did not properly evaluate Plaintiff's symptoms.  (Doc. 9 at 1-2.)

## A. *Lay Opinion*

Plaintiff asserts the ALJ based the RFC on lay opinion which is reversible error. (Doc. 9 at 7-8.) Defendant responds that the ALJ appropriately evaluated medical opinion evidence in assessing Plaintiff's RFC. (Doc. 10 at 5-13.) The Court concludes Plaintiff has not satisfied her burden of showing that this claimed error is cause for remand.

First, this claimed error warrants little discussion in that Plaintiff mistakenly asserted that "the ALJ *rejected* all opinion evidence regarding Cousins' physical impairment" (Doc. 9 at 7 (emphasis added)) while also acknowledging that the ALJ gave "partial weight" to the opinions of Drs. Patel, Jackson, and D'Eramo (*id.*). A review of ALJ Zanotto's Decision shows that she did not reject the opinions, in each instance she provided a reasoned basis for her assessments that the opinions were entitled to only partial weight. (*See* R. 30-31.) Contrary to Plaintiff's conclusory assertion that the ALJ failed to comply with the requirement of SSR 96-8p by failing to identify a basis for the RFC (*see* Doc. 11 at 1-2), the ALJ thoroughly reviewed the record and explained her consideration of Plaintiff's symptoms, both from a general perspective and in the context of the medical opinions of record. (R. 26-31.)

Second, Plaintiff's assertion that the ALJ should have obtained additional evidence (Doc. 9 at 8) is conclusory and

unfounded. Plaintiff's inference that the assignment of partial weight to the medical opinions created a legal void which the ALJ was required to fill is not supported by the caselaw cited, the record developed in this case, or the ALJ's Decision.

An ALJ has a duty to develop a full and fair record in Social Security cases, *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2004), but the duty does not relieve the claimant of her burden of proof, *Hess v. Sec'y of Health, Education, and Welfare*, 497 F.2d 837, 840 (3d Cir. 2005). Although it is "incumbent upon the [ALJ] to secure additional evidence needed to make a sound determination," *Ferguson v. Schweiker*, 765 F.2d 31, 36 (3d Cir. 1985), the requirement does not necessarily come into play where "there was sufficient evidence in the medical records for the ALJ to make her decision," *Moody v. Barnhart*, 114 F. App'x 495, 501 (3d Cir. 2004) (not precedential); *see also Griffin v. Commissioner of Social Security*, 303 F. App'x 886, 890 n.5 (3d Cir. 2009) (not precedential). If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See*, *e.g.*, *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *see also* 20 C.F.R. § 416.920b.

Plaintiff cites no specific evidentiary deficit in conjunction with the assertion that the ALJ should have sought another opinion assessing Plaintiff's functional capacity. (*See* Doc. 8 at 11.) She does not respond with any detail to Defendant's argument that

further development of the record was not warranted here because the ALJ had sufficient information to determine the issue of disability. (Doc. 10 at 12-13; Doc. 11 at 2.) In the circumstances presented here, i.e., Plaintiff's conclusory criticism of the RFC determination and the ALJ's thorough and reasoned analysis of the evidence, the Court cannot conclude that Plaintiff has shown that the ALJ lacked substantial evidence for her RFC determination.

## B. *Evaluation of Subjective Complaints*

Plaintiff contends the ALJ did not properly evaluate Plaintiff's subjective complaints because she referred to daily activities to discredit Plaintiff's allegations and she did not conduct an adequate pain analysis. (Doc. 9 at 9.) Defendant responds that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. (Doc. 10 at 13.) The Court concludes that Plaintiff has not shown the claimed error is cause for remand.

As with her first claimed error, Plaintiff's assertion regarding the consideration of daily activities is conclusory. She merely notes that the ALJ referred to her daily activities and cites *Smith v. Califano*, 637 F.2d 971-72 (3d Cir. 1981), in support of the proposition that "limited daily activities, generally performed in the privacy of one's home, are not on [sic] any way inconsistent with Cousins' assertion that she cannot perform

26

sustained work activities, 8 hours a day, 5 days a week." (Doc. 9 at 9.) As daily activities are properly considered when an ALJ evaluates the intensity and persistence of an individual's symptoms, *see* SSR 16-3p, 2016 WL 1119029 at *7, Plaintiff must do more far more than she has done here to sustain her burden of establishing error.

Similarly, Plaintiff's conclusory statements regarding the ALJ's pain analysis (Doc. 9 at 9) do not satisfy her burden of showing error on the basis alleged. After stating that "the ALJ should have considered the location, duration, frequency, and intensity of his [sic] pain, precipitating and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain and functional restrictions" (Doc. 9 at 9 (citing SSR 96-7p)), Plaintiff points to no specific deficit in the ALJ's analysis and simply concludes the ALJ "did not conduct this required pain assessment" (*id.*). As set out by Defendant with citation to the ALJ's Decision, the ALJ considered all of these factors. (*See* Doc. 10 at 16-18 (citations omitted).) In her reply brief, Plaintiff does not refute Defendant's argument or undermine her supporting citation to the record.[5] (*See* Doc. 11.) Therefore,

_____

[5] Plaintiiff states in her reply brief that "the Commissioner refers to Cousins' non-compliance with treatment to discredit her." (Doc. 11 at 3 (citing Doc. 10 at 18).) This statement is factual to the extent Defendant refers to noncompliance found in the ALJ's Decision and the record. (*See* Doc. 10 at 18 (citing R. 29, 473, 705, 720).) However, Plaintiff's conclusion that Defendant uses this statement to discredit her is subjective characterization.

Plaintiff has not met her burden of showing error on the basis alleged.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: November 2, 2017

---

(*See id.*) Importantly, the statement is not responsive to Defendant's basic argument that the ALJ addressed factors relevant to symptom evaluation. The following statement that "the Commissioner failed to address why the ALJ did not question Cousins' [sic] regarding this alleged non-compliance with recommended treatment during the hearing" (Doc. 11 at 3 (citing SSR 16-3p ("We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with her or her complaints."))) if inferentially considered an assertion that the ALJ erred in her consideration of Plaintiff's alleged non-compliance is both insufficiently and improperly raised. As noted in the text, an inferential assertion does not satisfy Plaintiff's burden of showing error. Moreover, the Court does not consider an argument raised for the first time in a reply brief because an argument not raised in the opening brief is deemed waived. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993); *see also Lucas v. Barnhart*, 184 F. App'x 2014, 2016 n.1 (3d Cir. 2006) (not precedential).